REPUBLIC NATIONAL BANK OF DALLAS, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11690. Promulgated November 28, 1947.

*J. P. Jackson, Esq.*, and *S. G. Winstead, Esq.*, for the petitioner.
*J. Marvin Kelley, Esq.*, for the respondent.

1040

## OPINION.

ARUNDELL, *Judge*: The first issue concerns the amount includible in petitioner's equity invested capital under section 718 (a) (2) of the Internal Revenue Code as property paid in for stock, on account of the North Texas assets acquired by petitioner in 1929. That section provides that "Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange." The question is whether that basis is petitioner's cost, i. e., fair market value of the stock at the time of its issuance (Regulations 109, sec. 30.718–1; Regulations 112, sec. 35.718–1), or a substituted basis, i. e., the same as it would be in the hands of North Texas. The respondent

contends that it should be a substituted basis under section 113 (a) (7), which provides that where property was acquired "by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them  *  *  *  then the basis shall be the same as it would be in the hands of the transferor."

The respondent's position is based on the somewhat technical theory that all the petitioner's stockholders prior to the merger of North Texas owned an equitable interest in the Republic National Co., which in turn held 4,250 shares of stock in North Texas; that, therefore, immediately before the transfer all the stockholders of petitioner and all the stockholders of North Texas together owned the entire interest or control in North Texas' assets; and that immediately after the transfer all of the petitioner's stockholders, then including the former stockholders of North Texas, owned the entire interest or control in such property. This theory, however, is predicated on the assumption that the merger or consolidation became effective in October 1929 when the assets of North Texas were physically delivered to petitioner. The issue before us has been considerably simplified by respondent's concession on brief that if the merger or consolidation did not become effective until December 28, 1929, there was lacking the necessary continuity of control to make section 113 (a) (7) applicable.

It is the respondent's view that the merger or consolidation became effective in October 1929, and that the ratification by the stockholders of both banks and the approval by the Comptroller of the Currency were mere formalities. With that view we are unable to agree. The agreement between the banks expressly provided that the merger or consolidation should become effective only upon ratification and confirmation by the necessary two-thirds vote of the stockholders of both banks and the approval of the Comptroller. Moreover, both banks being national banks, their consolidation was governed by Federal banking laws and could not become effective without the approval of the Comptroller. 40 Stat. 1043; 12 U. S. C. § 33. The stockholders did not ratify and confirm the merger or consolidation until December 26 and the Comptroller did not approve it until December 28, 1929, and his approval was made effective as of the close of business on that day. We accordingly hold that the petitioner should be sustained on the first issue.

The second issue is whether petitioner is entitled to any allowance for new capital on account of the million dollar increase in its capital stock on October 16, 1941. Under section 718(a) (6), the concept of "new capital" embraces money paid in for stock during a taxable year beginning after December 31, 1940. In such case an additional amount equal to 25 per cent of the new capital is allowed in computing equity

invested capital. The effect of such allowance, coupled with the provisions of section 718(a)(1), is to take new capital into account at 125 per cent. There are, however, certain limitations upon the allowance, among which is that contained in section 718(a)(6)(D), which provides that "The new capital for any day of the taxable year * · * * shall be reduced by the excess, if any, of the amount computed under section 720(b) with respect to inadmissible assets held on such day, over the amount computed under section 720(b) with respect to inadmissible assets held on the first day of the taxpayer's first taxable year beginning after December 31, 1940." Section 720(b) is set out in the margin.[1]

Petitioner contends that the limitation in section 718(a)(6)(D) merely requires that the ratio between inadmissible assets and total assets must not increase. We do not agree. Section 720(b) provides that in computing the amount of assets, both admissible and inadmissible, the adjusted basis of each asset is the amount attributable to that asset. We think it clear that the term "amount computed under section 720 (b) with respect to inadmissible assets held on such day," appearing in section 718(a)(6)(D), means simply the mathematical sum of the adjusted bases of the inadmissible assets.

The respondent made no new capital allowance because the inadmissible assets on October 16, 1941, exceeded the inadmissible assets on December 31, 1940, by more than the amount of the new capital. His action was in accord with his regulations on the point (Regulations 109, sec. 30.718–4, as amended by T. D. 5092; Regulations 112, sec. 35.718–4), which we think properly interpret the statute in accord with Congressional intent. See H. Rept. No. 1040, 77th Cong., 1st sess., 1941–2 C. B. 434, 450; S. Rept. No. 673, 77th Cong., 1st sess., 1941–2 C. B. 496. It follows that the petitioner is not entitled to the claimed allowance for new capital.

The third issue relates to income received by petitioner in 1940 and 1941 in the Commodity Credit Corporation transactions, which petitioner contends is exempt from normal and excess profits tax. In support of its contention petitioner relies on section 5 of the Act of March 8, 1938, 52 Stat. 108, 15 U. S. C. section 713a–5, which reads as follows:

---

[1] (b) RATIO OF INADMISSIBLES TO TOTAL ASSETS.—The amount by which the average invested capital for any taxable year shall be reduced as provided in section 715 shall be an amount which is the same percentage of such average invested capital as the percentage which the total of the inadmissible assets is of the total of admissible and inadmissible assets. For such purposes, the amount attributable to each asset held at any time during such taxable year shall be determined by ascertaining the adjusted basis thereof (or, in the case of money, the amount thereof) for each day of such taxable year so held and adding such daily amounts. The determination of such daily amounts shall be made under regulations prescribed by the Commissioner with the approval of the Secretary. The adjusted basis shall be the adjusted basis for determining loss upon sale or exchange as determined under section 113.

Bonds, notes, debentures, and other similar obligations issued by the Commodity Credit Corporation under the provisions of this Act shall be deemed and held to be instrumentalities of the Government of the United States, and as such they and the income derived therefrom shall be exempt from Federal, State, municipal, and local taxation (except surtaxes, estate, inheritance, and gift taxes).  *  *  *

Section 4 of the same Act, in pertinent part, is as follows:

With the approval of the Secretary of the Treasury, the Commodity Credit Corporation is authorized to issue and have outstanding at any one time, bonds, notes, debentures, and other similar obligations in an aggregate amount not exceeding $500,000,000.  Such obligations shall be in such forms and denominations, shall have such maturities, shall bear such rates of interest, shall be subject to such terms and conditions, and shall be issued in such manner and sold at such prices as may be prescribed by the Commodity Credit Corporation, with the approval of the Secretary of the Treasury.  Such obligations shall be fully and unconditionally guaranteed both as to interest and principal by the United States, and such guaranty shall be expressed on the face thereof, and such obligations shall be lawful investments and may be accepted as security for all fiduciary, trust, and public funds the investment or deposit of which shall be under the authority or control of the United States or any officer or officers thereof.

Petitioner contends that the cotton producers' notes or the contracts it had with the Commodity Credit Corporation constitute obligations which are exempt under those statutes.

The mechanics of the transactions in question were that petitioner made loans to producers of cotton or, in the majority of instances, purchased cotton producers' notes from other banks or lending agencies. Loans were made to producers of cotton under the program of loans on agricultural commodities authorized by the Act of February 16, 1938, section 302 (c), 52 Stat. 43, 7 U. S. C. § 1302 (c).  The obligations in the first instance were those of the cotton producers who received the loans and were the makers of the notes.  It is true that the notes were secured by pledged warehouse receipts covering cotton in storage, and that the producer was not to be liable for any deficiency upon the sale of the pledged cotton except in the case of fraudulent representations. These notes bore interest at 4 per cent.  Petitioner had contracts with the Commodity Credit Corporation whereby the latter agreed to purchase eligible cotton producers' notes at face value, plus interest in certain cases of 2½ per cent and in others of 1 per cent.  After making direct loans or purchasing cotton producers' notes from other banks or lending agencies, petitioner would subsequently sell the notes to the Commodity Credit Corporation and collect the face value, plus the stipulated interest.

That petitioner, in entering into these transactions, may have thought they would be tax exempt is of course not controlling.  Only in a very broad, loose sense of the term can it be said that the cotton producers' notes and the purchase contracts were "obligations" of the

Commodity Credit Corporation. We think it quite apparent on the face of the statute upon which petitioner relies that they were not the types of obligations which Congress, by section 5 of the Act of March 8, 1938, intended to exempt from taxation. The terms used are "Bonds, notes, debentures, and other similar obligations issued by the Commodity Credit Corporation." Under section 4 of the Act, the obligations were to be in such forms and denominations, to have such maturities, to bear such rates of interest, to be subject to such terms and conditions, and to be issued in such manner and sold at such prices as might be prescribed by the Commodity Credit Corporation with the approval of the Secretary of the Treasury. They were to be fully and unconditionally guaranteed by the United States, and the guaranty was to be expressed on their face. These provisions obviously do not fit either the cotton producers' notes or the purchase contracts here in controversy.

For the reasons stated, we hold that the income received by the petitioner in 1940 and 1941 from the Commodity Credit transactions was not tax exempt.

Reviewed by the Court.

*Decision will be entered under Rule 50.*